**IT IS ORDERED as set forth below:**



**Date: February 22, 2017**

_____
**James R. Sacca
U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No.: 15-51556-JRS |
| CALITA ELSTON ROBINSON, ) | |
| ) | Chapter 7 |
| Debtor. ) | |

# ORDER

The issue before the Court is what does "interest at the legal rate" mean under Section 726(a)(5) of the Bankruptcy Code for purposes of a distribution on unsecured claims in a Chapter 7 case if the estate has sufficient assets to pay post-petition interest on those claims. Does the phrase mean interest at the federal judgment rate or does it mean the applicable non-bankruptcy rate on the unsecured claim that existed prepetition?[1]

---

[1] Specifically, this issue was raised by George Robinson, the Debtor's ex-husband, who has a pre-petition judgment against the Debtor for non-domestic support obligations, which judgment states that the claim accrues post-judgment interest at a rate of 7.38%. Mr. Robinson's priority, domestic support obligation has already been paid in full while this case was pending as a Chapter 13 case, so the interest rate on that portion of the claim is not at issue here. Furthermore, the interest rate for distribution purposes under Section 726(a)(5) does not necessarily alter the interest rate a creditor can collect from the debtor on a non-dischargeable claim outside of the bankruptcy distribution scheme.

1

The leading case interpreting this phrase to mean the federal judgment rate is *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002). *Cardelucci* considered this issue in the context of a Chapter 11 plan confirmation. In that case, the Ninth Circuit Court of Appeals held that Section 726(a)(5) requires interest to be paid at the federal judgment rate for the following reasons: (1) Congress chose the more specific language of "interest at the legal rate" instead of the more general, originally proposed language of "interest on claims allowed" and the chosen language used the more definite "the" instead of an indefinite "a" or "an", thereby indicating Congressional intent for an interest rate derived from a common, single source, that being the federal statute awarding interest on judgments; (2) the federal judgment rate is consistent with the general rule that post-petition interest is procedural in nature and, therefore, dictated by federal law, entitling a creditor to an award of interest pursuant to a federal statute; (3) a single, uniform rate is equitable to all unsecured creditors and ensures that no single creditor receives a disproportionate share of assets; and (4) trustees should not be burdened by having to determine and calculate the appropriate rate for each individual unsecured creditor.[2] *In re Cardelucci*, 285 F.3d at 1234-36. See also, *In re Hedrick*, 343 B.R. 762 (Bankr. E.D. Va. 2006) (finding federal judgment rate is proper); *In re Country Manor of Kenton, Inc.*, 254 B.R. 179 (Bankr. N.D. Ohio 2000) ("legal rate" was the substitute for "interest on claims allowed," which hints at uniformity in applications); *In re Melenyzer*, 143 B.R. 829 (Bankr. W.D. Tex. 1992) (the federal judgment rate is consistent with the analytical nature of the Bankruptcy Code); *In re Godsey*, 134 B.R. 865 (Bankr. M.D. Tenn. 1991) (the federal judgment rate is most applicable to the Section 726(a)(5)

---

[2] Very few other unsecured creditors have filed claims in the case before this Court. Two of them, Bank of America and Cavalry SPV I, have not even identified what their contractual pre-petition interest rate was in their proofs of claim. Another, Beverly Cohen, had her contract claim liquidated in state court post-petition after the stay was lifted to do so, but the jury did not award pre-petition interest. If the federal judgment interest rate was not the applicable rate, imagine the expense, particularly in a larger case, that a trustee would incur if she had to contact each creditor to supplement their claims to provide the pre-petition interest rate and how the trustee and court would solve the problem of what to do in the event creditors did not respond to such a request.

context given the language of that section and the language of other sections of the Bankruptcy Code); *In re Laymon*, 117 B.R. 856 (Bankr. W.D. Tex. 1990), *rev'd on other grounds*, *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72 (5th Cir. 1992) ("There is no good reason why one unsecured creditor should receive a greater share of the…'pie' solely by virtue of its prepetition contract interest rate when the rationale for paying interest under Section 726(a)(5) has nothing to do with the prepetition contracts of the debtor."); Carmen H. Lonstein & Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421 (2004) (suggesting *Till* would favor the selection of federal judgment rate for post-petition interest on unsecured claims because the right arises under the same provision in all chapters).

  The Court finds that the first two of the four reasons set forth in *Cardelucci* are compelling based on the language of Section 726(a)(5) and other sections of the Bankruptcy Code dealing with the allowance of claims and the allowance and disallowance of post-petition interest. The last two of the four reasons, although compelling as policy considerations and based on the language of federal judgment interest rate statute, 28 U.S.C. Section 1961, since the changes made to it in 1982, are not as compelling based on a reading of that statute when the Bankruptcy Code was passed in 1978 and became effective in 1979. From 1982 until 2000, 28 U.S.C. Section 1961 based the federal judgment rate on the Treasury's 52-week United States Treasury Bills auction and then from December 21, 2000, until the present, the federal judgment rate has been based on "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceeding." That statute since 1982 is certainly consistent with the policy considerations set forth in the third

and fourth reasons articulated in *Cardelucci* because the rate is clearly uniform and, therefore, equitable to creditors and easy for trustees to apply.

However, when the Bankruptcy Code was passed in 1978 and became effective on October 1, 1979, 28 U.S.C. Section 1961 provided that the federal judgment interest rate was "the rate allowed by State law." This was interpreted to mean the state law in which the federal court sits. *See, e.g.*, *In re Goldblatts, Bros., Inc.*, 61 B.R. 459, 466 (1986); *Beecher v. Able*, 435 F. Supp. 397, 411 (S.D.N.Y. 1977). State laws were then and still are all over the board on how to calculate interest on judgments. Some states had and still have fixed interest rates on judgments; some had and still have post-judgment interest rates of a fixed amount unless the claim is based on a contract, in which event the contract rate would be applicable, but perhaps only up to a certain percentage; others had and still have post-judgment interest rates based on the lesser of the contract rate or a fixed percentage; and in some states, there appears to be a trend toward basing the post-judgment interest rate on a federal index or a prime rate plus a certain percentage.[3] The point of this is that at the time Section 726(a)(5) was drafted and became effective, although the federal judgment interest rate statute may have provided for a somewhat more uniform and somewhat less burdensome rate to administer, it really cannot be

---

[3] For example, in 1978 and 1979, New York state law provided for a post-judgment interest rate of 6% which was increased to 9% in 1981. N.Y. CIVIL PRACTICE LAW AND RULES § 5004 (1981). Florida provided that interest on a judgment was 6% unless it was rendered on a written contract providing for a lower rate, in which case the judgment would be at the lower rate in the contract, but the statute since 2011 has based the rate off of the discount rate of the Federal Reserve Bank of New York plus 400 basis points, except the amount in a written contract will control. *Compare* 1967 Fla. Laws 591, *with* FLA. STAT. § 55.03 (2011). California law previously provided that interest rates were limited to 7% except for contracts, which were limited to 10%, until amended to the interest rate which today is 10%. CAL. CIV. PRAC. BUSINESS LITIGATION § 54:22; CAL. CIVIL PROCEDURE CODE § 685.010. In Illinois, the post judgment interest rate was 8%, but was increased to 9% in 1982 and remains at that rate today. *Compare* 1977 Ill. Laws 2656, *with* 1981 Ill. Laws 1422 *and* 735 ILL. COMP. STAT. 5/2-1303. In Texas, judgments accrued interest at 6% unless the rate in the contract exceeded that amount, in which event the contract would control, but not to exceed 10%, but since 1999 the law is that interest on a judgment based on a contract is the lesser of the contract amount or 18% while all other non-contract cases have an interest rate based off of a rate published by the Board of Governors of the Federal Reserve System. *Compare* 1925 Tex. Rev. Civ. Stat. 1418, *with* TEX. FINANCE CODE ANN. § 304.002 *and* TEX. FINANCE CODE ANN. § 304.003. In Georgia, the interest rate on judgments was 12%, but the current law is a judgment rate based off of a rate published by the Board of Governors of the Federal Reserve System. *See* 1980 Ga. Laws 1118; O.C.G.A. § 7-4-12.

said that Congress was interested in instituting a single, uniform rate or that it was particularly interested in lessening a trustee's burden because so many state laws did not provide for a uniform rate. However, the fact that two of the four factors discussed in *Cardelucci* are not as compelling as the other two factors does not necessarily mean that Congress did not intend for the federal interest rate statute to be the "legal rate" applied in Section 726(a)(5).

One of the leading cases interpreting the phrase "interest at the legal rate" to mean the applicable, non-bankruptcy interest rate on each specific claim that was in effect pre-petition, such as the rate in a contract or a state court judgment, is the recent case of *In re Dvorkin Holdings, LLC*, 547 B.R. 880 (N.D. Ill. 2016), which reversed the bankruptcy court that held the federal judgment rate was the applicable rate. Like *Cardelucci, Dvorkin* was also decided in the context of a Chapter 11 plan confirmation. It primarily found that the Bankruptcy Code does not mandate payment of interest at the federal judgment rate when there is surplus in the estate and that in such a case there is a presumption that post-petition interest should be paid pursuant to terms of the contract. *Dvorkin Holdings, LLC*, 547 B.R. at 891-92. The court stated that before it could determine whether the creditor was impaired by the plan under Section 1124, the issue of what interest the creditor was entitled to must be decided first. *Id.* at 891. Because it did not see the Congressional intent to change pre-Code practice, the court relied upon *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946), a pre-Bankruptcy Code case that used a "balance of the equities" test to determine that it would be an inappropriate windfall to the debtor if money was returned to the debtor because creditors were deprived of their bargained for contractual interest. *Dvorkin Holdings, LLC*, 547 B.R. at 892. See also *In re Fast*, 318 B.R. 183 (Bankr. D. Colo. 2004) (although acknowledging (a) that if Congress intended to use a rate other than a statutory rate, it would have used language other than "legal rate," and (b) that the federal

5

judgment rate is efficient, the balance of equities should be used to determine the rate of interest); *In re Beck*, 128 B.R. 571 (Bankr. E.D. Okla. 1991) (creditors should be restored to pre-bankruptcy position so "interest at the legal rate" was the rate "which creditors would have been entitled through any appropriate legal proceeding had bankruptcy petition never been filed").

Additionally, *Dvorkin* cited a House Committee Report from 1994 to support its reliance on pre-Code law. *Dvorkin Holdings, LLC*, 547 B.R. at 894 (discussing the Committee Report, 1994 U.S.C.C.A.N. at 3336-57). The portion of the Committee Report discussed in *Dvorkin* deals with an amendment to Section 1124. That section deals with impairment of claims. Impairment, in turn, affects the right to vote on a Chapter 11 plan. The Committee Report stated that in order for a Chapter 11 plan involving a solvent estate to be "fair and equitable" as required under Section 1129(b)(2) with respect to a class of impaired, non-accepting unsecured claims, those claims had to be paid in full, including with post-petition interest, before equity holders could participate in any recovery. The Committee Report concluded that a class of claims would be impaired and entitled to vote unless the class of claims was paid the full principal amount of their claims plus post-petition interest. Consequently, the Code was amended to delete Section 1124(3) which could be read to the contrary. The Committee Report cited some pre-Code cases to establish the meaning of "fair and equitable." It should be noted, however, that the Committee Report did not discuss how to determine the post-petition interest rate, only that post-petition interest had to be paid for a plan to be "fair and equitable" for purposes of Section 1129(b), and it cited pre-Code cases that supported a creditor's entitlement to post-petition interest in a solvent estate as part of what is "fair and equitable" in the context of confirmation of a chapter 11 plan. Because those pre-Code cases applied interest at the contract rate, *Dvorkin* assumed that Congress must have intended that pre-Code practice to continue in

the context of a Chapter 11 plan confirmation. The court also found instructive the Seventh Circuit case of *In re Terry Ltd. P'ship*, 27 F.3d 241 (7th Cir. 1994). That case, though, involved the language "interest on such claim" found within Section 506(b), which deals with secured claims, rather than the language "interest at the legal rate" found within Section 726(a)(5), which deals with unsecured claims. *Dvorkin Holdings, LLC*, 547 B.R. at 897. Although *Dvorkin* acknowledged the different language, it contended that both phrases were ambiguous, so it circled back to rely solely on pre-Code case law, concluding that it would seem "fundamentally unfair to require a creditor to accept a lower interest rate than he bargained for." *Id.* at 897-98.

After reviewing the statute and the authorities discussing it, this Court believes *Cardelucci* is the better reasoned case and that the federal judgment rate is the correct rate to apply based on the phrase "interest at the legal rate." This Court rejects the reasoning in *Dvorkin* because Congress did adequately express its intention to have the interest rate found in the federal statute apply by choosing the more specific language of "interest at the legal rate" instead of the more general, originally proposed language of "interest on claims allowed." *In re Kravitz*, No. MW 00-070, 2001 WL 36381905, at *3 (B.A.P. 1st Cir. Feb. 16, 2001) ("If Congress intended for 'interest at the legal rate' to mean interest 'at the rate provided for under state law', they would have expressly stated that position in Section 726(a)(5), as they did in so many other sections."); *In re Country Manor of Kenton, Inc.*, 254 B.R. at 182 ("[A]n indefinite article … strongly suggests that Congress intended that a single rate of interest be used, as opposed to multiple rates of interest which would necessarily result if a contractual rate of interest was applied."). Because Congress inserted a "the" before "legal rate," it is apparent that it intended for courts to utilize the legal rate found in the federal statue, regardless of how Congress may decide to change the applicable rate under that statute in the future. *In re Energy Future*

7

*Holdings Corp.*, 540 B.R. 109, 114 (Bankr. D. Del. 2015) (noting that where Congress intends to use the contract rate, it so states); *In re Washington Mut., Inc.*, 461 B.R. at 243 (finding in reading the plain language of the statute, the federal judgment rate is the proper measure); *see also In re Smith*, 431 B.R. 607, 610 (Bankr. E.D.N.C. 2010) ("In light of the statutory language, this court is persuaded by the line of cases which hold the legal rate to be the federal judgment rate.").

Furthermore, as explained in *Cardelucci,* the application of the federal judgment rate is consistent with the general rule that post-petition interest is procedural in nature and dictated by federal law and is equitable to all creditors because unsecured claims are allowed in an amount as of the petition date and should be treated equally thereafter with respect to the distribution of estate assets regardless of the parties' pre-petition bargain. *See In re Energy Future Holdings Corp.*, 540 B.R. at 114 ("[T]he use of the federal judgment rate promotes two important bankruptcy goals: 'fairness among creditors and administrative efficiency.'"); *Steier v. Best*, No. 3:07cv-318-S, 2008 WL 5233185, at *1 (W.D. Ky. Dec. 15, 2008) (the federal judgment rate best promotes equality, fairness, and predictability in the distribution of creditors' claims); *In re Bayside Marina, Inc.*, 282 B.R. 285, 294 (Bankr. E.D.N.Y. 2002) (finding that bankruptcy cases, which originate in many jurisdictions, need to be governed by one uniform rate under federal law, specifically section 1961); *In re Kravitz*, 2001 WL 36381905, at *3 ("[W]e believe that [the federal judgment rate] approach best serves the purposes and policy considerations behind the Code."); *In re Dow Corning Corp.*, 244 B.R. 678, 685-86 (Bankr. E.D. Mich. 1999) ("The delay in payment … results almost entirely from the procedural mechanisms of the bankruptcy laws …. The purpose of post-petition interest, then, is to compensate a successful creditor.").

This Court also disagrees with *Dvorkin's* reliance on *Vanston's* equitable approach to determine the post-petition interest rate payable to unsecured creditors. As noted in *In re Manchester Gas Storage, Inc.,*

> In *Vanston,* the Supreme Court noted that courts, invoking their equitable discretion, had routinely allowed postpetition interest to accrue to a *secured* creditor if the value of the collateral exceeded the outstanding debt. *Id.* at 164, 67 S.Ct. 237. Since equity allowed oversecured creditors to recover postpetition interest, the Court likewise examined the equities to determine whether the particular *undersecured* creditors before them should be permitted to benefit from a surplus of the liquidated estate by recovering interest that would have accrued but for the equitable prohibition. *Id.* at 164–65, 67 S.Ct. 237. …
>
> This Court is not comfortable with the notion that the *Vanston* case gives permission to present-day bankruptcy courts bound by the Bankruptcy Code to override Section 502(b) of the Code by invoking equity. The Code specifically adopted parts of the pre-Code jurisprudence concerning postpetition interest in Sections 502(b) and (b)(2), 506(b), and 726. Congress eliminated the subjectivity of pre-Code discretion and specifically prohibited allowance of postpetition interest by enacting Section 502(b) and specifically mandated allowance of such interest in enacting 506(b) and 726(a)(5). The concept that postpetition interest is a matter of the bankruptcy court's equitable discretion has been superseded by statute.

309 B.R. 354, 384-85 (Bankr. N.D. Okla. 2004).

This comment makes sense because a claim for unmatured, post-petition interest at the contract rate on unsecured claims is disallowed under Section 502(b)(2) and, instead, Congress determined that an unsecured creditor's entitlement to post-petition interest from the estate, if a surplus of assets exists, is found in Section 726(a)(5) and the calculation of that amount would be based on "the legal rate." Post-petition interest is not part of the allowed claim pursuant to Section 502(b)(2), but the Code provides when and at what rate that post-petition interest can be paid on the allowed claim pursuant to Section 726(a)(5). *In Energy Future Holdings Corp.*, 540 B.R. at 113 ("The distinction in section 726(a)(2) and (a)(5) … supports the plain meaning interpretation of section 502(b)(2), i.e., an allowed unsecured claim cannot include post-petition

9

interest."); *In re Dow Corning Corp.*, 244 B.R. at 685-86 ("Properly understood, then, interest under § 726(a)(5) is paid *on* an allowed claim (as stated in the statute itself), rather than *as* an allowed claim."). Basically, this is like treating the unsecured creditor as if it obtained a federal court judgment against the debtor on the day of the filing of the petition on which it would receive interest at the federal judgment rate thereafter if assets are available. *In re Laymon*, 117 B.R. 856, 862 (Bankr. W.D. Tex. 1990), *rev'd on other grounds*, 958 F.2d 72 (5th Cir. 1992); *In re Chiapetta*, 159 B.R. 152, 161 (Bankr. E.D. Penn. 1993) ("[S]ince a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing."). This Court cannot say that such an approach is an unreasonable way to draft the Code.

*Dvorkin's* contract rate approach also appears at odds with the Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004). See Carmen H. Lonstein & Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421, 430 (2004). In *Till*, the Supreme Court specifically rejected the contract rate approach in favor of a prime plus rate of interest, albeit for purposes of cramdown in a Chapter 13 case, but the principles supporting that decision are relevant to the matter before this Court. *Till v. SCS Credit Corp.*, 541 U.S. at 477-78, 124 S. Ct. at 1960; Carmen H. Lonstein & Steven A. Domanowski, *Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421, 430 (2004) ("The same approach adopted in *Till* would clearly favor the selection of the Federal Judgment Rate … because regardless of whether the case arises in chapters 7, 11, or 13, the right to pendency interest arises under the same provision."). In so holding, the Supreme Court referred to "the now irrelevant terms of the parties' original contract" and also stated:

> Moreover, the resulting "prime-plus" rate of interest depends only on the state of the financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, *not on the creditors' circumstances or its prior interactions with the debtor.*

*Till*, 541 U.S. at 480, 124 S. Ct. at 1961 (emphasis added).

Because the Supreme Court in *Till* was not concerned with the debtor getting a perceived windfall in the event the prime plus interest rate was lower than the contract rate so that the debtor was permitted to retain a lender's collateral while arguably depriving the creditor of its bargained for interest rate, it would seem that *Dvorkin's* concern about that issue with respect to the payment of interest on unsecured claims is neither warranted nor consistent with the statutory scheme found in the Bankruptcy Code. *See id.* at 478, 124 S. Ct. at 1961 (discussing "the now-irrelevant terms of the parties' original contract" and how the coerced loan, presumptive contract rate, and cost of funds approaches improperly focus on making the creditor whole); *see also In re Washington Mut., Inc.*, 461 B.R. at 244 (agreeing that a debtor should not have to pay senior creditors more than the Bankruptcy Code allows just because of a contractual agreement); *In re Ogle*, 261 B.R. 22, 30 (Bankr. D. Idaho 2001) ("[B]ankruptcy by its very nature deprives creditors of the benefit of their agreement with a debtor. Consequently, such a factor, standing alone, doesn't persuade this Court." (quoting *In re Country Manor of Kenton, Inc.*, 254 B.R. at 181)). Furthermore, the Supreme Court also expressed concern that the contract rate approach violated the principle of equal treatment of creditors. *Till*, 541 U.S. at 476-77, 124 S. Ct. at 1959-60 ("Rather, the court should aim to treat similarly situated creditors similarly.").

The previously discussed concern expressed in *Manchester Gas*, that being the use of equitable principles to determine how to calculate post-petition interest to unsecured creditors in the face of federal statutes that specifically deal with the issue, is particularly insightful in light

11

of the Supreme Court's subsequent decision in *Law v. Siegel*, 541 U.S. ____, 134 S. Ct. 1188 (2014), which decision specifically prohibits bankruptcy courts from using their equitable powers to create a remedy contrary to the existing statutory scheme.  The *Dvorkin* court was clearly troubled by the apparent windfall the debtor would receive in that case if the federal judgment rate of interest was applied so it resorted to equitable principles to prevent that result.[4] But in drafting sections 502 and 726, "Congress balanced the difficult choices" and "it is not for courts to alter the balance struck by the statute."  *Law v. Siegel,* 541 U.S. at ___, 134 S.Ct. at 1197-98.  In the face of what this Court sees as a clear statutory scheme with respect to payment of interest on unsecured claims in a Chapter 7 case and the Supreme Court's decision in *Law v. Siegel*, this Court does not believe it is appropriate for a court to weigh equitable considerations to impose its own result contrary to the statutory scheme. *In re Garriock*, 373 B.R. 814, 817

---

[4] Since the method of calculating the rate was changed in 1982 until it changed again in 2000, the rate has been as high as about 12% and as low as about 3%, but since the method of calculating the rate was changed again in 2000, the rate has not been higher than 5.25% and has been as low as .09%.  Therefore, from a practical standpoint, this issue is probably only litigated in the uncommon case in which the estate is not only solvent but also when the federal judgment interest rate is relatively low, as it has been for many years, and which currently sits below 1%.  When both of those situations exist, if the relatively low federal judgment rate is applied post-petition instead of the contract rate, it gives rise to the concern that the debtor is getting some type of windfall, which can be viewed by some as being inequitable.  But if the federal judgment rate was really high, as it was in the early 1980's, we could have the solvent debtor arguing that the lower contract rate should apply to prevent the unsecured creditors from allegedly getting a windfall.  The concern about different parties getting alleged windfalls at different times is a decision involving competing policies for Congress to make and it chose to draft the statute in a way that placed a higher priority on the uniformity of treatment of unsecured creditors.  Consequently, the argument in *Dvorkin* that we should not be concerned about creditors receiving a disproportionate piece of the pie in a case where all creditors are paid in full with interest at the contract rate, 547 B.R. at 897-98, is misplaced because Congress preferred a policy to the contrary and, therefore, decided that the federal judgment interest rate statute should control.  Also, this argument in *Dvorkin* could create confusion of what to do in the situation when there are sufficient assets to pay unsecured creditors their entire principal, but only some, but not all, of their post-petition interest, regardless of what interest rate is applied, so the issue of a windfall to the debtor would not exist.  In that situation, holders of some unsecured claims could receive some payment of interest, for example, at a rate of perhaps 24% or more, while other creditors may receive some payment of interest at a lower rate, perhaps only at only a few percent, thereby providing the former with a disproportionate piece of the pie, when the Code has a policy of equal treatment of similarly situated unsecured creditors.  In that situation, under *Dvorkin,* would the court rely upon equitable considerations to disallow the contract rate of interest in favor of the rate in the federal statute?  There is certainly no basis in the Code for the application of such equitable considerations to change what Congress meant by "the legal rate" on a case by case basis and it certainly appears from the statutory scheme that Congress did not intend for this interest rate issue to be litigated in every solvent or near solvent case.   "Nor, given the statutory interpretation analysis set forth above, is the Court free to interpret "the legal rate" in different ways depending on the 'specific factual circumstances before the court.'" *Garriock*, 373 B.R. at 817, quoting *Cardelucci*, 285 F.3d at 1236 (citing *In re Thompson*, 16 F.3d 576, 581 (4th Cir. 1994).

(E.D. Va. 2007) (noting that even if the court does not think Congress adequately considered the potential windfall to a solvent debtor, the court is not at liberty to substitute its own policy judgment for the work of Congress).

Finally, both *Cardelucci* and *Dvorkin* dealt with the payment of interest on unsecured claims in a solvent Chapter 11 case. The issues of the interest rate to be applied to a class of unsecured claims in a Chapter 11 case to determine whether (a) the class is impaired pursuant to Section 1124 and, therefore, entitled to vote on a Chapter 11 plan, or (2) the Chapter 11 plan is fair and equitable with respect to the cramdown of a class of dissenting unsecured claimants pursuant to Section 1129(b), are not present in a Chapter 7 case. Not only do they involve different issues not involved in a Chapter 7 case, but they also involve different Code sections and are subject to potentially different policy concerns. Because the Court does not have those issues before it today in this Chapter 7 case, it will not address them in this Order.

Accordingly, it is hereby

ORDERED that the interest rate to be applied under Section 726(b)(5) is the rate set forth in the federal judgment interest rate statute.

**END OF DOCUMENT**